This case is 4-14-0173 and 0182 Consolidated Cases. In 0173, Ameren Illinois Company Petitioner Appellant v. Illinois Commerce Commission et al. In 0182, it is Dominion Retail Incorporated and Interstate Gas Supply of Illinois, Inc. Petitioner's Appellants v. Illinois Commerce Commission et al. And Counsel, could I have appearances please? On behalf of Dominion Retail, Inc. and Illinois, I'm sorry to go. Alright, thank you. Good afternoon, your honors. On behalf of Ameren Illinois Company, Albert Sturdivant of the law firm Alright, thank you. And as between the two of you, it's my understanding that you wish to split your time ten minutes apiece, is that correct? Yes, sir. Alright, thank you. And Counsel? Yes, James E. Wagen, Special Assistant Attorney General, on behalf of the Respondent of Illinois Commerce Commission, my offices are at the Commission offices in Chicago. Alright, thank you. Who wishes to proceed first? Your honor, if I may. Alright, Mr. Sturdivant? Yes, you may proceed. Good afternoon, your honors. As indicated, my name is Albert Sturdivant, Counsel for Ameren Illinois Company. What I want to talk to you about today is Utilities Return on Common Equity. This case is not about the appropriate deference to the ICC in its rate making function. This case is about the arbitrary and unexplained action of an administrative agency. The Commission cannot arbitrarily jump back and forth in its approaches, make sudden shifts in methodology without explanation, ignore evidence of record, or treat one utility materially different from another without articulating a basis for doing so. Specifically, the Commission has acted arbitrarily when, in June of 2013, for the Illinois gas utility Peoples North Shore, it set rates using a financial model that contained two unremarked inputs. But then, six months later, for the Ameren Illinois gas utility, the Illinois Commerce Commission set rates by rejecting the use of the same financial model, saying the same two inputs were of concern to the Commission. The order does not explain why what was perfectly acceptable in Peoples North Shore cannot be used in this case. In short, the type of data was the same, the financial model was the same, but the outcome was different, and the result was unexplained. It is well established that an agency cannot act arbitrarily. The Commission cannot do one thing in one case and then, without explanation, do the opposite in another. This makes sense because consistency is needed to allow the regulated utility the opportunity to understand the regulatory landscape and to plan. Thus, the utility should be able to understand these are the models and here's how they work. And this is especially true of the rate of return issue. This is a tremendously important issue, the most important issue in most cases in a utility rate case. The utility's revenue requirement, as the Court is undoubtedly aware, is the amount of money the utility needs to provide service to customers. That includes a rate of return on invested capital. The rate of return includes a component for the return of equity. This matters a great deal financially. The difference between what the Commission approved for return on equity, 9.08%, and what Ameren Illinois proposed in its refund exceptions and application for rehearing, 9.34%, amounts to approximately $2.5 million. The Commission staff's original position differs from the utility's original position by over $15 million. This is a case where the utility was requesting a $50 million rate increase and received approval from the Commission for a $32 million rate increase. As its own orders make clear, the Commission uses two models, a discounted cash flow analysis and what is at issue here, something called a capital asset pricing model, which estimates the cost of equity for a given security as a function of a risk-free return plus a risk premium. This is in turn determined by something called a beta coefficient, which measures relative risk to the market multiplied by an overall market return. Undoubtedly, these are complex financial models, but the point that Ameren Illinois is making is not a complex point. Ameren's concern is that the order arbitrarily rejected its expert's CAPM result. So why was this arbitrary? The order's rejection was purportedly based on concerns about two of the inputs into the CAPM model, the beta coefficient and the expected overall market return. Ameren Illinois' expert used beta factors calculated with five years of data. Didn't the Commission explain why it was departing from what it said in North Shore? It did not, Your Honor. In fact, the order does not discuss the North Shore order at all, much less any reason for departure from that order. So the expert, Ameren Illinois' expert, used beta factors with five years of data, non-dividend-paying companies in his calculation of the expected market return. These same types of inputs were present in the People's North Shore model six months earlier. That model was not rejected. So both North Shore and Ameren Illinois models include non-dividend-paying companies. Both North Shore and Ameren Illinois models use five-year value-aligned betas. In North Shore, these inputs were of no concern, and the utility's CAPM was included in the Commission's calculation. Yet in the order in this case, use of similar inputs was of concern to the Commission, and the utility's CAPM model is excluded. So what was once no concern is now a concern. And to your question, Your Honor, none of this was explained. The Commission must explain itself. Under Section 10204E of the Public Utilities Act, the Commission's order does not contain findings or analysis sufficient to allow informed judicial review. The Court shall remand the order. And here, the order does not answer the fundamental question of why. Why did the Commission reject the utility's CAPM model in its calculation of return on equity? Why does the Commission do this? We don't really know. The order devotes only three paragraphs out of a 252-page order to its decision on this critical issue of the CAPM. And in those three short paragraphs, it never explains why it is rejecting the CAPM. The Commission fails to explain why it has a problem with elements of Ameren Illinois' CAPM when it didn't have a problem with those same elements six months earlier. In fact, it fails to mention, as I said before, people's North Shore order at all. It says that staff inputs are more reliable, but it doesn't say why or how more reliable. There is no finding that the utility CAPM was mathematically incorrect, that the calculations were wrong, or that the model itself, which is a model that the Commission relies on, in most cases, as the Commission has said so, that the model was inherently wrong. The order... Isn't a big part of your argument, though, that the Commission's decision in the North Shore establishes some kind of precedent from which the Commission may not depart without explanation? I would not say that the argument is that the North Shore order establishes a precedent that is somehow binding on the Commission. Rather, the North Shore order presents an approach in which certain elements were included in the model, and the model was included in setting rates. Six months later, the Commission does something completely different. It looks at two inputs that were previously in the model and were no problem, says these are a cause for concern. They throw the model, the utilities model, out of the calculation. This is arbitrary and unexplained, and so that's really the concern, is that the arbitrariness of the Commission's decision and the lack of explanation as to why it was doing something differently six months later. The Commission is obligated to, as I said earlier, not act arbitrarily and capriciously, and also to explain its decision. We have a report that's 240 pages long. It's almost strange to be arguing that, despite this report from the Commission, they didn't explain what they were doing. I agree. I think that it is strange, and what the utility – well, certainly I think the utility believes that the outcome was so arbitrary that the court could simply reverse the Commission's decision. But at the very least, the utility would like a more fulsome, complete explanation of why. So I agree. It is a long order, and in that long order, there are very few paragraphs devoted to addressing and explaining and providing sufficient findings and analysis to justify this important conclusion that makes a significant and material conclusion. I would note also that there's another reason for reversing the Commission's order, and that is that it's not supported by the record. For one, the order is just wrong with respect to one of the inputs. The order says that the utility data measurement period was 18 to 24 months, when in fact it was not. There was also five-year data, which is the type of data the Commission looks for, included in that. So that statement is simply incorrect. The order also fails to consider the exclusion of non-dividend-paying companies from an overall market rate of return. As the utility pointed out in its testimony and briefings, it doesn't make sense to include – if your factor is the overall market rate of return, it doesn't make sense to exclude the non-dividend-paying part of the market. That creates a subset. And again, this was not explained. So in conclusion, Your Honors, as I previously said, we would urge you to reverse, or at the very least, remand for explanation. Thank you. Thank you. Now, Mr. Moore, are you going to proceed next? Yes, I'll proceed next.  Yes, thank you. May it please the Court. My clients are what are known as alternative gas suppliers under Article 19 of the Public Utilities Act that gives them authority to provide gas service to residential and small commercial customers. The Commission in this case, in addition to all the rate cases that you just heard about, authorized Ameren to establish a small-volume transportation customer service. It said you shall do it. It is in the public interest. It did defer the actual terms of that tariff to the next case, but it did find that there will be a SBT, or small-volume transportation customer tariff. And what we are bringing this appeal about is that within that, the Commission ordered alternative gas suppliers to abide by three what are called consumer protections. And we've argued in our briefs here that the Commission had no authority under the Article 19 to make alternative gas suppliers comply with those three conditions. They are inconsistent with the Act. Now, before I get into that, I should address the issue of rightness, which has been raised by the Commission. The standard for rightness is whether, first of all, whether the case is fit for review and whether there be harm to parties if it is not being reviewed. This case is fit for review. The Commission entered a final order. It found that SBT is in the public interest. And we're raising a legal issue here, whether the Commission has authority under the Public Utilities Act to do this. So that's the kind of thing that courts do consider. In terms of harm to the parties, this is the only case that we have the ability to raise this. In the next case that is ongoing now, the Commission figures out what the tariff will be for SBT. That is simply on the tariff itself. However, in this case, these three conditions were not ordered for Ameren. Ameren doesn't have to do them. Ameren doesn't even put them in their tariff. I attached to our reply brief a copy of the tariff that is being considered in this next case, and it doesn't mention these three conditions because these three conditions are given to the alternative gas suppliers. Ameren isn't enforcing it. Ameren isn't even telling anybody about it. Did you finally raise before the Commission your objection to these three commissions or these three new protections? These three new protections were raised by the Citizen Utility Board. They recommended them, and we objected to them in our briefs. Was that before the hearing was held? Well, the way the Commission does their proceeding to file or pre-file written testimony, so parties filed their direct testimony. In that case, CUB just said you should have some conserved protections. In their reply testimony, they said these are the three we think you should do, and then there were hearings. Actually, another thing that happens in many of these cases is that parties tend to perhaps waive cross-examination and instead just introduce into the record discovery, which we did in this case. We had discovery of the CUB witness that we introduced as exhibits. So because this isn't a rider SBT case, it really is that this is the only opportunity we have to raise this issue. There is no other case that these three conditions will be out there, and whenever the Commission does approve an SBT tariff, they will be there. You seem to be arguing two different things with regard to some of these consumer protections. One of them is a claim that it's not supported by the evidence, but another with regard to the 10-day period is you're arguing that this is contrary to a specific statute. Is that right? Yes. The statute is very explicit. It says that there shall be 10 days from when a bill is issued, whereas the Commission has decided that generally it would be when the bill is due, which is going to be later, and for door-to-door sales where someone approached a customer and signed them up, they have six months to revoke the contract without having to pay an early termination fee. And the statute says 10 days. Ten days is 10 days. There's nothing in the statute that says at least 10 days or no more than 10 days. There's nothing in the entire Article 19 that gives the Commission authority to impose conditions that are different than those imposed in Article 19. Article 19 is very explicit. It has very detailed rules for alternative gas suppliers, and there's nothing in there that gives the Commission authority to do anything beyond those. If you look at the Commission's briefs, they cite some of their general authority over utilities, but, again, those are in different parts or articles of the Public Utilities Act that are for utilities. Article 19 explicitly gives the authority that the Commission has over alternative gas suppliers. It lists a few provisions in the Articles 8 that apply to alternative gas suppliers, but none of those are relevant to these three conditions. So, you know, our argument is that the statute is clear and the Commission decided we know a little better than General Assembly. We'll throw additional consumer protections in there that are not in the Act. And there's simply nothing in the Act, either Article 19 or anywhere else, that gives the Commission that general authority. In your brief, you quote from Section 19-115G5B, talking about the 10-day statutory provision, and unless I'm missing it, maybe I'll certainly be asking Mr. Weigang, do they talk about that statute in their brief at all? They simply say that the Commission can go beyond it. Well, that's not my question. They cite the statute and talk about why your argument about the statute doesn't work. Yeah, I get it. They've cited the statute, but they've said they can go beyond it. Where in their brief do they mention the statute? Looking at page 31, the Commission decision concerning the three consumer protection conditions is supported by substantial evidence, and I'm the one that follows. I'm looking for a discussion of the specific statute, and I don't see it. And this is in Mr. Weigang's brief? Yes. I'll ask Mr. Weigang. It's entirely possible I just missed it, but go ahead. Their argument, you can ask him, is certainly that the Commission has general authority over utilities, but these aren't utilities. So your claim is this is a specific statute that the one consumer protection violates by providing more time than the statute provides? Actually, two. One was for general, say, for example, if you sign them up by telephone or by Internet, it's the due date of the bill instead of 10 days, and for door-to-door, it's six months instead of 10 days. And, by the way, on the door-to-door, there's very explicit provisions in Article 19 that apply to door-to-door. The Act applies the Consumer Fraud Protection Act to them. It requires also that they have what they call a third-party verification, where a customer and the salesman get on the phone with a third party, not affiliated with the utility, and they then get the salesperson off the phone, and the third party verifies that, yes, indeed, you want this company to take your service. So there's very explicit rules for door-to-door, and, again, the General Assembly decided that's all that's necessary. It didn't think there was a need for six months of a grace period. The final provision that we address is the Consumer Notification. If the utility, I'm sorry, if an alternative gas supplier tries to compare its rates to the utility, the Commission now requires them to give three years of data, at least quarterly, which, again, there's nothing in the Act that allows them to do that, and the Act has, in fact, explicitly gives the Commission a mandate to create a website and have bill comparisons so that utilities, so customers can compare different rates. There's nothing about this three years of comparison, nothing about quarterly. So, again, the Commission has added something that's not in the Act, and, again, the Act is explicit and very detailed, and the Commission, because this is not a utility but rather independent companies, they are subject to this Act and not the general provisions that the Commission likes to cite as its authority. Thank you, Your Honor. All right, thank you. Mr. White. If you have no more questions, I'm sorry. Yes. Your response. To Amrit. The evidence concerning the just and reasonable level of the return on equity is entirely based on evidence submitted by expert witnesses based on their process studies of the just and reasonable amount of return on equity. It's not just the studies. As the Court is aware, the Commission order goes from page 128 to 166 saying, so-and-so said this, the other side said this is wrong to them, and they replied, and you go through all those pages, and then the Commission comes to termination. Amrit's witness recommended a 10.4 percent return on equity. The staff recommended 8.81. Now, getting to this very particular issue about CAPM studies. Amrit is, of course, arguing that a single decision not involving Amrit constitutes a prior Commission practice that has been violated here. The plain fact is that the underlying North Shore People's Gas case doesn't constitute anything but an individual decision. The Commission acting as a decision maker as to what should happen with those utilities. The staff in this case pointed out that the record hearing did not contain any information allowing for it in comparison of Of course, the Commission is not a judicial body. There's no res judicata. We are free to address each matter before the Commission, even if its issue is identical to a previous case. I cited lots of cases. Mississippi River Fuel is, of course, the lead case on that. Isn't it bad form if you change the standards of your analysis within six months in cases of this kind? What standards? I don't know that that's necessary to answer that question. Just assume there's a standard of analysis used in case one, and six months later you use a different standard of analysis. You seem to be arguing that, well, it doesn't matter. I'm not sure if it matters at all, but it seems to me to be at least bad form, isn't it? The CAPM studies are done by three separate experts. In this case, there were three separate expert witnesses, and of course their witness actually did three separate studies. A CAPM study doesn't stand by itself. It means there's an expert witness going through, trying to say, well, here are comparative returns that are applicable to this, and therefore would form the basis of what I'm recommending, which is an actual number. Let me ask you this, John. So did Aberin argue the earlier study and analysis to the Commission? Are you talking about the previous case? The North Shore case. Yes, they did. In the petition for reconsideration, they say, wait a second, you're departing from North Shore? We didn't in North Shore create a process, a rule, or a precedent. I try to ask my questions carefully. Okay. When possible, they call for a yes or no answer. Give me a yes or no answer. Did Aberin argue to the Commission in a petition for reconsideration that you're departing from the North Shore analysis? Yes. Okay. In responding, shouldn't the Commission, for the reasons you just said, if all cases are different, provide some explanation as to the departure, why North Shore was different? Well, because the evidence submitted in the case indicated that, one, the Reliance Council's making on the, there was no issue raised similar to in North Shore people. So the underlying pristine didn't decide anything about CAPM studies. All they're saying is an expert in another case may have done the same thing as their witness has, and no one questioned it. So now that sets a precedent. Does that analysis and explanation appear in the Commission's order? The Commission's order. Counsel. Yes, it did. Listen to my question. Yes. Does it appear? And where, if so, does it appear? Well, as to the rejection of the North Shore. Yes. Or why it was different, and we don't, we're not following the same. Well, the Commission found that the betas estimates provided in the staff in this study here. Counsel. Counsel. My question was, does the distinction from what was before the Commission in North Shore, why they're not using the same analysis, appear in the Commission's report? If you're saying an explicit finding from the Commission saying it doesn't apply here. Something along these lines. I don't. Amron argues in the petition for rehearing that North Shore is being deviated from. We should be able to rely on it, and there's no explanation why it's being departed from. Amron is wrong, and here's why. And maybe the people. Does that appear anywhere? Explicitly, well, they wouldn't. The Commission does not issue anything other than a grant or denial of application for a hearing, so they have to be in relation to their exceptions to the proposed order. Having said that. They could amend the order to, like this court, amended order upon denial of petition for a hearing. They could have done that, couldn't they? They, generally speaking, the grant or denial of a hearing. Counsel, could they have done that, was my question. Honestly, I don't think so. They'd have to deny rehearing. They'd have to grant rehearing to do issue any more findings if they're going to do that. If you're denying rehearing, then you're not dealing with anything. I'm interested, as you heard in the question about section 19-115G5B, and I apologize in advance if you discussed that specific subsection in your brief, but I missed it. Well, this case isn't a section 19-115B case. Well, is that subsection 119G5B cited anywhere in your brief and analyzed in response to the arguments raised by Mr. Moore? As to the third condition, it was, since the Commission is authorized to issue standards of service through section 8301 of the Utility Act as applying through 19-115. Well, maybe I'm not being clear. In the original brief and in his reply brief, Mr. Moore quotes from section 19-115G5B, which contains the 10 business day reference. He says the Commission's action exceeds what the legislature has said is the time in which these contracts may be undone. What I'm asking is, in your brief to this Court, do you address that subsection and explain why his argument isn't well taken? Yes, I do think, Your Honor, because I say the evidence supports this finding. The first part of my question was, do you address that subsection and explain why that argument isn't well taken? I object because the Commission has jurisdiction to issue the conditions as they lay out in the brief. Nothing in section 19-115B provides the Commission is barred from doing this. Do you provide us with any analysis of that subsection in your brief, explaining why the arguments made by Mr. Moore aren't soundly based? Well, for one thing, I'm sitting here arguing about three conditions that may never see the light of day. Counsel, I asked a specific question. Do you cite that subsection in your brief and explain why it doesn't apply? Because the Commission has the authority on Article 9 to condition a tariff of Ameren and did so in this case, which is what is before the Court. There is no Article 19 order to anyone. These conditions do not apply to anyone as yet and may never, unless they're adopted, is somehow in the case that's still pending decision. So I'm not getting involved with an argument about what my client may or may not do under an Article 19. So that's an explanation as to why you chose not to address the argument that he made. Because the Commission does not issue this order on the basis of Article 19. So the answer then to my question is no, you did not address that specific subsection in the arguments he made. Can you explain why you didn't? I didn't because it's not here. This is an Article 9 rape case with conditions being adopted, whatever that means, in a proposed rider that doesn't exist yet. Counsel's here arguing that, oh, well, this is going to come in the action, but we don't have a rider in place and we may not have a rider in place. I just don't know. Counsel cited in his reply on Page 2 the Big River Sink case, saying this was a similar sequence. In Big River Sink, though, the court dismissed the case for lack of ripeness because the establishment of the rider was taking place in the subsequent proceeding. On Page 38 and to 40 of that case, it almost reads as in this case. So is it your position that the arguments Mr. Moore made with regard to that subsection aren't ripe for adjudication by the commission of this court? As to the legal issue, yes. I have problems, admittedly, with the factual issues because the evidence apparently was only placed into this case, but I think the evidence supported the commission's conclusions to adopt. I'm still sitting here. I just misunderstood. Didn't the commission adopt these three additional consumer protections? Yes, that's what they said. What does that mean if there is no rider to which that exists? I'm not sure I understand your answer. Well, if these conditions are applicable to the alternate gas suppliers, how does that work? How does that happen? It has to be contained somewhere where we ordered them to, and the commission has, this order does not contain an order saying all alternate gas suppliers in Ameren territory must do FY&E. Do you mean Mr. Moore's clients can ignore the commission's order with regard to the three additional consumer protections? Sure, they were adopted related to the opening of Ameren's territory through rider SVT. They don't exist anymore. So they can ignore these consumer protections? Well, take it this way. There is a lot more alternate gas supplier than these two companies. So they can ignore the consumer protections that the commission set forth? Until the commission establishes rider SVT with the three conditions still in. Then I'll amend my question. At this point in time, they can ignore the three consumer protections? Yes. They were an intervening party. The party to this case is Ameren. Not two gas suppliers out of goodness knows how many we have in the state of Illinois who might be interested in going to Ameren territory. Getting back to the Ameren case, the commission at page 134 of its order indicated the major areas of disagreement between Mr. Herbert, I probably mispronounced his name, the Ameren witness and Ms. Phipps, the staff witness, as to the spot yields on the risk-free rate and also a calculation of overall market return. The commission has criticized the use of a spot yield in prior cases. Ms. Phillips also alleged, this is on page 135 of the order, alleged Mr. Herbert's beta coefficients are faulty. This is expert testimony the commission hears all the time. The commission adopted Ms. Phipps' CAFM study only and obviously adopted that once again, which they had done in the previous case, rejected Ameren's CAFM. If there was a precedent, it should be the previous time in which the commission had rejected the CAFM-Ameren studies. Incidentally, they did three of them, not just one. Their own witness said that their CAFM studies were not reconcilable with the staff CAFM studies. I don't know how you reconcile when the witness supporting it says they are not reconcilable. However, the termination of an appropriate return on equity is not a manual formula, but it is a question of pragmatic business judgment to which the commission's decision is entitled to great weight. I cited the Apple River case. As the court is aware, Rider SVT has still not been established or rejected by the commission. So I have no idea what's going to happen if and when it is. To quote the... The Ripeness Doctrine is designed to prevent the courts from avoiding premature adjudication until an administrative decision has been formalized and its effect be felt in a concrete way by the challenging parties. I don't know what's going to happen. In this case before the court, these conditions were made part of a particular rider of an Ameren tariff. They're adopted. But that rider doesn't exist. Counsel has pointed out, and I don't doubt him, that in fact these conditions are not contained in the rider. Well, there's no such thing as a secret protocol of a rider. If the commission is conditioning this rider as I think they intended to avoid the problems we had when we opened up other territories in the state of Illinois to competitive alternate gas supply, it has to be there in some way. Before the court, this is what the commission said they were doing. They may be deciding, if the case gets to them, to do something else that I can't even address. I can't even ask my clients what they're going to do about this. In most of the other rider cases the courts have, except for Big River, Zinc, and maybe one or two others, the commission said go fill the rider out, and the rider got done six months, a year later, and it was in. So there was never this kind of gap. I will tell the court, it's my understanding, that rider restitution is not something that was supposed to be in place last quarter of 2014. At the present time, some of the parties in the underlying case have now said it won't be until late 2016, and the costs are more than treble than what was when the commission approved the idea of rider restitution. These conditions do not exist separately from the rider. The commission did not call all the alternate gas suppliers in the state of Illinois and say, here, you shall do this. The commission was creating conditions within a rider. Okay, and two of the consumer protections ask counsel to do something different than the universal protections that John Selma has created for the other territories in the state of Illinois who already have alternate gas suppliers. But nothing in Article 19 bars the establishment of additional consumer protections, especially under the facts of this case that we are opening a new territory, and every time we have previously done it, we get thousands and thousands of complaints of customers saying we were misled, we were lied to, blah, blah, blah, and our authority to do things about that is somewhat limited. Utilities under our, I mean, gas suppliers are required to meet conditions within the utility tariffs. That's 19-120B3 of the Act. We have the authority to enforce those conditions, and it makes no sense to say, oh, well, but you don't have any jurisdiction to actually approve or have conditions on something related to the alternate gas suppliers. And as I pointed out, the third consumer protection about standardization of price comparison, which is at the heart, often, of people taking the service, falls under the commission's jurisdiction under Section 8301 of the Act as adopted by 19-115B1. Having consistent price comparisons meets the policies of the Utility Act, specifically 1-102D2, public understandably, and it's a small room in two, and a small room in five, orderly transition. And frankly, as to the third condition, council has never pointed out this violates a single provision within 19. They just say, well, whatever. Like I say, the commission supported this case on the basis of the evidence submitted, which was not contested. All the parties cited to the commission about the previous programs, the first one where we had 14,000 cancellations out of 52,000 customers within a few months, and the second case, we had a similar number of cases. I couldn't tell anywhere how many contracts were canceled or not. And the commission would really like to avoid the reoccurrence of a similar level of consumer complaints when Amarin Service Territory is opened up with an SVT program. Mr. Cohen's evidence was put in the record. No one cross-examined him. No one objected to his testimony as an expert witness. The evidence needed for the conditions is only that a reasoning mind would accept is sufficient to support a particular conclusion. And lots of cases are cited. 268 up 30, 471 is one. And there is really no evidence that an opposite conclusion is clearly evident, which is what the alternative gas suppliers have to show under Connell-Mobile and Conwell-Hesenthal. The need for the three additional consumer protections is a matter of the commission's discretion in designing the Rider SVT program. And I cited Illinois Power, the 316 on up third, and the old Institute of Shortening and Edible Oils Inc. case of 45 and a half third. The commission doesn't have to wait for something to break down in order to act. They came up in public safety where they said, well, you can't do any improvement on railroad safety unless someone's been injured or killed there. And I said, no, you don't have to wait for that. And on top of this, of course, the commission is dealing with its history of opening up natural gas markets and the difficulties with house-to-house sales and confusionally different and incomparable gas cost comparisons in the marketing materials. Having said that, at some point I had hoped that by the time this case was heard that we would have the Rider in place so the ripeness issue would go away. But frankly, we keep telling you, both the other side and I, what's going on in this other case and the other case is unresolved and there is no Rider and there's no consumer protection yet applicable and there won't be until Amarant SVT tariff is approved. With that, I'll conclude. Thank you. All right. Thank you. Mr. Sturdivant, are you next for reply? Yes. All right. You may proceed. Thank you, Your Honors. Counsel for the commission mentioned that Amarant, Illinois, was arguing that prior commission practice was established in the people's case and that it violated. But that is not, in fact, what we were arguing. I think the law is clear that the commission can't do one thing in one case and a different thing in another case. Certainly, the law requires that the ICC… Why is the law clear in that? After all, these are different cases, all facts. We're a bunch of experienced trial judges up here, and even though there might be great similarities, I've never seen two cases that are the same. They're adjudicant bodies called upon to evaluate these requests. Why can't they do it differently? Well, I think in terms of the legal requirement that an agency not act arbitrarily in between cases, and particularly the commission can't make a decision in one case and then do something different in that case. I think that's clear. The cases we cited in our briefs, Citizens Utility Board from 1995, Illinois Power Company… Well, if the North Shore case weren't in existence, there'd be no claim about the arbitrariness of this case, would there? Well, I'm not sure that's completely true. I mean, yes, you wouldn't have done one way in this case and then done completely differently in another case. But counsel also referenced the prior case, prior Ameren, Illinois, 2011 case as serving as a source of precedent. But, in fact, Ameren, Illinois had their return on equity expert had made some changes from the 2011 case. Those were not addressed in the order either. So I think even in the absence of the North Shore case, and, of course, we do have the North Shore case, you still have a fundamental lack of explanation as to why the commission came to the conclusion it did. Not only because it didn't mention North Shore, but because it did not address a variety of other issues. I asked Mr. Regan whether or not the commission, in responding to your petition for reconsideration, could have addressed this argument specifically. And as you heard, he says he's not sure if they could and doubted that they could. I actually believe, Your Honor, that they could. I think they could have granted rehearing for the purpose of issuing a new order to address this. Or they could have denied it and explained why not with a supplement? I'm not aware of any requirement that would prohibit them from explaining the basis for their denial of a petition. It seems a little odd for the argument on the one hand to talk about the broad authority the commission has to carry out policies, but suggest that they can't explain the denial of a petition to reconsider. I would agree. I think that they would have that power if it was something of this important nature. Or they could have granted rehearing. Or they could have addressed it by addressing it in the final order after it was brought up on exceptions. I think that counsel for the commission points to a lot of evidence. There was a lot of evidence on this topic. Evidentiary points that were made in the record. I think that that really illustrates the key point, though. None of that evidence was discussed in the order. Whether certain evidence should get certain weight or other evidence should get other weight, none of that was discussed. So it needed 340 pages of a report, not just 240? Correct. But I think the important thing is not just the recitation of what was said, but the analysis of what was said. And that finding and analysis is what is lacking, which is why we are urging reversal, or at the very least, remand. Thank you, Your Honor. Thank you. Mr. Moore? Mr. Moore, are you surprised to hear that your clients can disregard the commission's decision? I was about to address that, Justice. No, they can't, because they don't have authority to provide service until Ameren has a program. Ameren has to give them the customers, has to provide the gas service in its system, and it won't do that. So the answer to Ameren is yes, they're ready to go. Suddenly, at that point, you can't proceed, but now you're subject to the new consumer protections. Exactly. Once that tariff is approved and Ameren starts its program, these conditions will be there. And it doesn't matter whether they're in Ameren's tariff or not. So the only thing that's certain is the approval for Ameren or not? That's right. But once Ameren, the answer is yes, then you know what you have to do. Exactly, because the commission, in its order, said that we will not consider, everything that we've decided here on issues will not be raised again in this Rider case. So we're not allowed to even raise the issue of commission reconsider these three. They already said we don't hear about it. This is decided already, and the only thing we're going to do in this case that's now ongoing is setting up the details of exactly, you know, how some of these minor rules between utilities and alternative gas suppliers work. I've taken up all your time. I apologize. Is there anything else that you want to say? A little bit. I was a little surprised to hear Mr. Wedding say that at the very beginning, well, there's nothing in Article 19 that says we can't do it. That's not the way the commission as an agency works. They have to, their only authority is what the statute gives them, and this statute doesn't give them authority to do what they've done, therefore they don't have it. It's not a, if they don't stop us, we can do whatever we want. So that's the first thing I really want to address. He did mention the evidence of these prior cases. I'll finish my time. Thank you. All right. Thank you, counsel. The case will be taken under consideration, and a written decision will issue. Thank you.